# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

CHAZ DIONYOUS BUNCH,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 24 MA 0030**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2001 CR 1024

**BEFORE:**
Katelyn Dickey, Carol Ann Robb, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Gina DeGenova*, Mahoning County Prosecutor*, and *Atty. Ralph M. Rivera*, Chief, Criminal Division, and *Atty. Edward A. Czopur*, Assistant Prosecuting Attorney, for Plaintiff-Appellee and

*Atty. Joseph C. Patituce and Atty. Megan M. Patituce,* Patituce & Associates, LLC, for Defendant-Appellant.

Dated: October 22, 2024

**DICKEY, J.**

**{¶1}** Appellant, Chaz Dionyous Bunch, appeals from the February 12, 2024 judgment of the Mahoning County Court of Common Pleas. This matter came before the trial court on remand from the Supreme Court of Ohio, *State v. Bunch*, 2022-Ohio-4723, to conduct an evidentiary hearing on the eyewitness identification claim in Appellant's petition for post-conviction relief. Following the hearing, the trial court found that Appellant's trial counsel was not ineffective during the jury trial in choosing not to call an eyewitness identification expert. On appeal, Appellant asserts the trial court abused its discretion in denying his petition for post-conviction relief because he established his trial counsel was ineffective. Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

**{¶2}** This court extensively set forth the relevant facts and procedural history underlying this matter in Appellant's last appeal, *State v. Bunch*, 2021-Ohio-1244 (7th Dist.):

> On October 2, 2002, a jury found Appellant guilty of three counts of rape, three counts of complicity to rape, aggravated robbery, kidnapping, and eight firearm specifications. He was also convicted of aggravated menacing, a misdemeanor. *See State v. Bunch,* 7th Dist. No. 02CA196, 2005-Ohio-3309 (reversing a conviction for conspiracy to commit aggravated robbery, affirming remaining convictions, and remanding for resentencing on a maximum of three firearm specifications). Following the initial appeal, Appellant was sentenced to an aggregate sentence of 89 years in prison. *State v. Bunch,* 7th Dist. No. 06MA106, 2007-Ohio-7211. He received consecutive terms of ten years on each of the eight felonies, with the misdemeanor menacing count running concurrent, plus three years on each of the three firearm specifications. *State v. Bunch,* 7th Dist. No. 06MA106, 2007-Ohio-7211.

The events leading to his indictment and convictions . . . are as follows:

Early in the evening on August 21, 2001, Jason Cosa, Christine Hammond and Jason's grandfather were returning to Jason's home located at 190 Maywood, Youngstown, Ohio. (Tr. 808, 814). After they had entered the driveway, a man wearing a mask (later admitted to being Brandon Moore), approached the car and robbed them at gunpoint. (Tr. 809-811, 826).

Neither Jason nor Christine could identify who the gunman was, but they did notice that he got into an awaiting vehicle that was a dark, older automobile. Both described the car as being dark and very loud. (Tr. 813, 829).

Later that night at approximately 10:20 p.m., M.K., a twenty-two year-old Youngstown State University student, arrived at a group home for mentally handicapped women to report to work for the evening; she worked the night shift. (Tr. 850, 854). The group home she worked at was located at 1322 Detroit Avenue, Youngstown, Ohio. (Tr. 855).

Upon arriving, she exited her vehicle and went to get her belongings out of the trunk of her car. (Tr. 855). On her way to the trunk, M.K. noticed an older, black automobile (referred to as black automobile) coming up the street and stopping a few houses away. (Tr. 862-863). At this point, she also saw a tall man running through the grass. (Tr. 863). The man wearing a mask, later identified as Brandon Moore, pointed a gun at her and instructed her to give him all her money and belongings. (Tr. 864). The porch light of the group home then came on and Moore instructed her to get into the passenger seat of her car. (Tr. 864). Moore climbed over M.K., positioned himself into the driver's seat, and drove away with her in the car. (Tr. 864).

Upon leaving the driveway, Moore, driving M.K.'s car, began following the black automobile. Shortly thereafter, Moore stopped the car and a second gunman exited the black automobile in front of them and entered the victim's car through the rear passenger's side door. (Tr. 870). The second gunman, later identified as Bunch, put a gun to her head and demanded her money and belongings. (Tr. 873). She now had two guns pointed at her, one from Moore and one from Bunch. (Tr. 874). After Bunch had entered the vehicle, Moore began to drive and continued to follow the black automobile.

As all of this was occurring, Moore began to compliment M.K. on her beauty. Moore then, while driving, inserted his fingers into her vagina. (Tr. 876-877). Moore was so infatuated with her that he nearly hit the black automobile in front of them. (Tr. 877). It was at this point that M.K. was able to see the license plate of the black automobile. She memorized the license plate number as "CTJ6243." (Tr. 872). While all this was occurring, Bunch still had the gun pointed at her head.

At some point while Moore was driving, the black automobile stopped leading and began to follow Moore. Eventually, Moore drove down a dead-end street near Pyatt Street in Youngstown, Ohio, and both automobiles pulled into a gravel lot. (Tr. 879, 881, 1038-1039). Bunch ordered M.K. out of the car. (Tr. 884). Moore and Bunch then took turns orally raping her; one of them would have his penis in her mouth, while the other would force her head down. (Tr. 887-888). Guns were pointed at her while this was occurring. (Tr. 888).

After Moore and Bunch were finished orally raping her, they forced her at gunpoint to the trunk of the car. (Tr. 889). At the trunk of the car, she was anally raped. (Tr. 893). While this was occurring one of the individuals from the black automobile, who was later identified as Jamar Callier, went through her belongings in the trunk and took some of the items. (Tr. 890).

The other individual in the black automobile stayed in the car the whole time and watched; he was later identified as Andre Bundy.

After the anal rape occurred, Bunch threw M.K. to the ground and then Moore and Bunch vaginally and orally raped her. (Tr. 895). While one of them vaginally raped her, the other would orally rape her, and then they would switch places. (Tr. 895-896). Both were armed as this occurred. (Tr. 895).

At some point while this was occurring, Bundy told Callier to stop what was going on. As a result, Callier pushed Bunch off M.K., helped her to her feet, and put her in her car. (Tr. 897, 1265-1266). This caused an altercation between Bunch and Callier. (Tr. 899). Bunch wanted to kill M.K., however, Callier told Bunch that he could not kill a pregnant woman. (Tr. 899). During the rapes, M.K. was pleading for her life and as part of that plea she claimed to be pregnant. (Tr. 893). Prior to her leaving, Moore and Bunch told her that they knew who she was and threatened to harm her and her family if she ever told what happened. (Tr. 900).

Once in her car, M.K. locked her doors and drove straight to her boyfriend's parents' house. While she was driving she kept repeating the license plate number of the car. (Tr. 902). Upon arriving at the house, the victim was hysterical, but she was able to scream out the license plate number, which someone wrote down. Her boyfriend's parents then immediately took her to the hospital. (Tr. 902). She arrived at the hospital at approximately 11:12 p.m. (Tr. 1029-1030).

At the hospital, her boyfriend's father immediately told Officer Lynch from the Youngstown Police Department that M.K. had been raped by individuals in an older black automobile with the license plate number "CTJ6423." (Tr. 1028). Officer Lynch was at the hospital for an unrelated matter, but when this information was given to her, she began broadcasting the plate number and the car's description over the police radio; this

occurred at approximately 11:13 p.m. (Tr. 910, 1027, 1029-1030). Officer Lynch then began obtaining further information from the victim, including a detailed description of the assailants and the crimes. Officer Lynch broadcasted the description of the assailants over the police radio.

While this investigation was occurring, a sexual assault nurse at the hospital examined M.K. and completed a rape kit. The rape kit included swabs of the victim's mouth, vagina, and rectum. (Tr. 1588-189). Once completed, the rape kit was sealed and taken into police custody. (Tr. 1045-1050).

At approximately 11:30 p.m. Youngstown Police Officer Anthony Vitullo, who was on patrol and had heard Officer Lynch's broadcast, pulled his cruiser into the Dairy Mart at the intersection of Mahoning Avenue and Bella Vista. He noticed a black car at pump seven. (Tr. 1061). As the car was pulling out he noticed that the license plate number on the car as "CTJ6243." (Tr. 1061). The plate number was not the exact number that had been broadcasted over the radio, however, the numbers were very close. The number broadcasted over the radio was "CTJ6423." Given that the car matched the description and that the license plate number was very similar to the one broadcasted, Officer Vitullo began following the car.

The black automobile pulled onto Mahoning Avenue and headed east toward downtown. (Tr. 1062). It then merged onto I-680 southbound and exited at the first exit, Glenwood Avenue. (Tr. 1063). The black automobile then ran the stop sign, turned southbound on Edwards Street, and pulled into the first driveway on the west side of the street. (Tr. 1063, 1065).

Officer Vitullo followed the car the whole time; however, he did not activate his overhead lights. Upon arriving at the Edwards Street address, Officer Vitullo remained at his car waiting for backup before approaching the car. (Tr. 1065-1067). Moments later backup arrived, including Officer

Schiffhauer from the YPD K-9 unit. The officers proceeded to the car. Upon reaching the car, the officers noticed that the driver of the vehicle had fled on foot. However, the passengers, Moore, Bundy, and Callier, remained in the vehicle and were subsequently arrested and detained. The passengers informed the police that the driver's name was "Shorty Mack."

At that point, the K-9 unit began trying to track the driver of the vehicle. Officer Schiffhauer was unable to track and find the driver, but he was able to determine that the driver headed west. (Tr. 1111).

At 11:50 p.m., Youngstown Police Officer Ronnie Jones heard the broadcast that the driver from the suspected automobile had fled on foot. (Tr. 1152-1155). He then set up a perimeter and positioned his cruiser on Glenwood Avenue near Bernard Street in Volney Rogers parking lot. (Tr. 1155). Approximately five minutes later Officer Jones noticed Bunch "trotting" by on Glenwood Avenue. (Tr. 1157-1158). Officer Jones placed the spotlight on Bunch and Bunch slowed to a walk. (Tr. 1157-1158). Bunch proceeded to the side door of 349 Glenwood Avenue and began knocking. (Tr. 1158-1159).

Lamont Hollingshead lived at 349 Glenwood Avenue. He opened the door when Bunch knocked, but Hollingshead would not let Bunch in because he did not know who Bunch was. Hollingshead testified that Bunch claimed to being chased by the police for a curfew violation. (Tr. 1184-1185). Bunch asked Hollingshead to tell the police he was Bunch's uncle. (Tr. 1184). Believing that the police were after Bunch for a curfew violation, Hollingshead complied with Bunch's request. (Tr. 1184).

Officer Jones questioned both Hollingshead and Bunch. Bunch informed the officer that he was sixteen years old, that his name was Chaz Bunch, and that he was on his way from his uncle's house to his cousin's house. (Tr. 1159-1161). Given the explanation and the fact that Bunch did not match the description of the driver that was broadcasted over the police

radio, Officer Jones let Bunch go. The description broadcasted over the radio was that the driver was wearing gray sweats and went by the name of "Shorty Mack." (Tr. 1161-1162, 1167-1169). Bunch was wearing navy blue pants, a navy blue top with a white T-shirt underneath it. (Tr. 1164). Moore was wearing gray sweatpants, thus, the wrong description was broadcasted over the radio. (Tr. 1162).

After Officer Jones left, Bunch paid Hollingshead to make a telephone call from his house. Bunch called Brandy Miller; Brandy Miller's testimony and telephone records confirmed this. (Tr. 1195-1198, 1572-1573).

Three days later, while at roll call, Officer Jones was informed that the subject that fled the automobile on the night of the rape was suspected to be Bunch. Officer Jones informed his superiors that on the night of the rape he had seen an individual who identified himself as Chaz Bunch. Officer Jones was shown a photo array with Bunch in it; he identified Bunch as the individual he saw on the night of the rape. Bunch was subsequently arrested.

During the investigation of the rape, the police inventoried the black automobile. In inventorying the car, the police found the victim's belongings. (Tr. 1071-1073, 1097, 1206-1208, 1211-1212). The police also found a vehicle registration and credit union card belonging to Jason Cosa. (Tr. 1213, 1251, 1406-1407). Also in the car was a .38 caliber handgun and one blue and one black wave cap. (Tr. 1073-1074, 1097, 1208-1209).

Additionally, in further investigating the crimes, the police interviewed M.K. On August 22, 2001, M.K. was shown a series of photographic line-ups. (Tr. 910-911, 1425, 1433). She positively identified Bundy as the driver of the dark older automobile that watched the entire time. (Tr. 913, 14488). She also identified Callier as the person who went through her trunk and as the person who stopped the rape. (Tr. 913-914, 1451-1452). She identified

Moore as the first gunman who abducted, robbed and raped her. (Tr. 919-920, 1446). She signed each individual photograph indicating the identifications. (Tr. 913, 920, 1446, 1448, 1451).

As to Bunch's identification, she was drawn to the photograph of him as being the second gunman, but she informed the detectives that she wanted to see a full body picture before signing the photograph. The police were unable to put together a full body array because they were unable to find juveniles of that build. (Tr. 1450). However, on September 7, 2001, the victim saw a local newspaper which showed a picture of Bunch from mid-chest up. Upon seeing this picture, the victim immediately knew that Bunch was the second gunman and called her victim-witness advocate to inform her of this information.

Furthermore, evidence that was obtained during the investigation was sent away for fingerprint and DNA testing. The rape kit was tested at BCI. The semen sample from the vaginal swab, rectal swab and the victim's shorts were not consistent with Bunch's DNA. However, it was determined that Moore could not be excluded; the chance of finding another individual with the same DNA as Moore was one in 94,000,000,000,000,000,000. (Tr. 1670). No fingerprints were found on the .38 caliber gun.

The police also obtained the video surveillance from Dairy Mart. Still pictures were made from the video surveillance. The pictures showed Callier and Bunch purchasing food and gas for pump seven.

Also, the police conducted interviews with the suspects. On August 22, 2001, Andre Bundy was interviewed by the police. Bundy admitted to being the driver of the black automobile. (Tr. 1419). Bundy also stated that he had Callier stop the rape. (Tr. 1421).

Moore was interviewed on August 23, 2001. He informed the detective that he was the individual who robbed Cosa and Hammond. He

stated that he was the individual who first approached M.K. and forced her into her car at gunpoint. He then admitted to raping her. (Tr. 1431). However, he claimed that he committed the crimes because an individual known as "Shorty Mack" made him do it. (Tr. 1464). He also claimed that the gun he used that night was a fake. (Tr. 1472).

Callier was then interviewed by the police and also testified at trial. (Tr. 1276-1400). He testified that both Bunch and Moore raped M.K. (Tr. 1264). He stated that Bunch was the driver of the black automobile when it left the Dairy Mart. He then stated that once Bunch pulled the car into the house on Edwards Street, Bunch told them to tell the police that he was "Shorty Mack." (Tr. 1274). Callier also saw the pictures from Dairy Mart and indicated that he and Bunch were in the pictures. (Tr. 1276).

*State v. Bunch*, 7th Dist. Mahoning No. 02 CA 196, 2005-Ohio-3309, ¶ 2-3.

Appellant filed a pro se post-conviction petition on June 12, 2003, which was not ruled on initially.

In April 2013, Appellant filed a Delayed Application for Reconsideration contending his sentence was unconstitutional pursuant to *Graham v. Florida*, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). Co-defendant Brandon Moore also filed a delayed application for reconsideration. We denied both applications. Those decisions were appealed to the Ohio Supreme Court.

While those decisions were pending in the Ohio Supreme Court, Appellant filed an application for DNA testing, which the trial court denied and we affirmed the denial. *State v. Bunch*, 7th Dist. Mahoning No. 14 MA 168, 2015-Ohio-4151.

Thereafter in 2016, the Ohio Supreme Court reversed our decision denying the delayed application for reconsideration of Brandon Moore's

sentence. *State v. Moore*, 149 Ohio St.3d 557, 2016-Ohio-8288, 76 N.E.3d 1127. The court concluded Moore's sentence was unconstitutional because "*Graham's* categorical prohibition of sentences of life without the possibility of parole for juveniles who commit nonhomicide crimes applies to juvenile nonhomicide offenders who are sentenced to term-of-years sentences that exceed their life expectancies." *Id.* at ¶ 100.

The Ohio Supreme Court, however, declined to review Appellant's denial of the application for reconsideration.

Approximately two months after the Ohio Supreme Court decision in *Moore*, Appellant filed his first amended postconviction petition. 2/22/17 First Amended Postconviction Petition. Three claims were raised in this petition. The first claim was based on the *Moore* decision. 2/22/17 First Amended Postconviction Petition. The second claim was based on the Ohio Supreme Court's decision in *Aalim I*, which held that the mandatory transfer of juveniles to the general division of a common pleas court violates the juveniles' right to due process as guaranteed by the Ohio Constitution. *See State v. Aalim*, 150 Ohio St.3d 463, 2016-Ohio-8278, 83 N.E.3d 862, ¶ 31 (*Aalim I*), *reconsideration granted, decision vacated,* 150 Ohio St.3d 489, 2017-Ohio-2956, 83 N.E.3d 883, ¶ 31 (*Aalim II*). While Appellant acknowledged that *Aalim II* vacated the *Aalim I* decision and held that there was no constitutional violation for mandatory transfers of juveniles, Appellant argued the issue to preserve it for appeal. 1/18/18 Defendant Response to State's Motion for Judgment on the Pleadings. The third claim was that appellate counsel was ineffective for failing to hire an expert witness regarding the unreliability of eyewitness identification. 2/22/17 First Amended Postconviction Petition. Appellant admitted counsel attacked the credibility of the identification on cross-examination, but argued an expert was needed to support that attack. 1/18/18 Defendant Response to State's Motion for Judgment on the Pleadings.

In response to the petition, the state filed a motion for judgment on the pleadings. 11/22/17 Motion. The state conceded that the first claim had merit and Appellant was entitled to resentencing. It argued the second claim failed based on *Aalim II.* As to the third claim, it contended counsel was not ineffective for failing to call an expert. Counsel relied heavily on cross-examination to demonstrate the victim's identification of Appellant as the fourth assailant was reliable.

The trial court granted the judgment in part and denied the judgment in part. 1/29/18 J.E. The trial court found merit with the first claim and ordered resentencing. 1/29/18 J.E. However, as to the second and third claims, the trial court denied them for the reasons asserted by the state. 1/29/18 J.E.

Appellant timely appealed the decision. After the briefs were submitted, the parties jointly asked for the appeal to be held in abeyance until a new sentence was imposed. 6/15/18 Motion. We granted the request and indicated that following the resentencing, Appellant could determine whether he needed to amend his notice of appeal.

Sentencing memorandum was filed by both parties, and a resentencing hearing occurred on September 6, 2019. The trial court sentenced Appellant to an aggregate sentence of 49 years. He received 3 years on each of the three firearm specifications for a total of 9 years. He received 10 years for aggravated robbery, 10 years for each of the three rapes to run consecutive to each other and consecutive to the aggravated robbery sentence. He received 10 years for each of the three complicity to rape convictions and 10 years for the kidnapping conviction. Those sentences were ordered to run concurrent to each other and concurrent with the other sentences. He also received 6 months for aggravated menacing, which was ordered to run concurrent to the other sentences.

A sexual classification hearing was then held. Since the crimes occurred prior to the tier system, Appellant was subject to the old classification system under Megan's Law. The trial court classified him a sexual predator.

Appellant amended his notice of appeal to include the sentence and sexual predator classification. This appeal can be divided into three parts. The appeal of the postconviction relief petition, the appeal of the sentence, and the appeal of the sexual offender classification.

*Bunch*, 2021-Ohio-1244, at ¶ 3-16 (7th Dist.).

**{¶3}** Appellant timely appealed the 49-year sentence and his sexual predator designation. This court combined Appellant's appeal regarding his post-conviction petition and the September 6, 2019 re-sentencing hearing. *See Id.*

**{¶4}** While this appeal was pending, Appellant filed a timely post-conviction petition pursuant to R.C. 2953.21 on November 6, 2020. Thereafter, he filed a first amended post-conviction petition on May 3, 2021. This separate petition was filed with respect to the September 6, 2019 re-sentencing hearing. Appellant filed this first amended petition pursuant to an agreement with the State to allow the amendment because COVID restrictions prevented counsel from interviewing a necessary witness and Appellant had the right to amend since the State had not yet filed a response to his petition for post-conviction relief. Appellant points out that DeJuan Adams, the purported victim in another one of Appellant's juvenile delinquency cases involving felonious assault which was dismissed, Case No. 2000 JA 288, originally told the detective that Appellant did not shoot him. Appellant indicates Adams was incarcerated at the time of Appellant's sentencing, not missing as suggested by the State.

**{¶5}** This court affirmed the trial court's denial of Appellant's post-conviction petition, his 49-year sentence, and his sexual predator designation. *Bunch,* 2021-Ohio-1244 (7th Dist.).

**{¶6}** Appellant appealed to the Supreme Court of Ohio which accepted jurisdiction. On December 29, 2022, the Supreme Court concluded that Appellant's ineffective assistance claim presented an issue that the trial court needed to examine at

an evidentiary hearing before reaching its decision. *Bunch*, 2022-Ohio-4723, ¶ 3. Thus, the Supreme Court reversed this court's judgment and remanded the case to the trial court to conduct an evidentiary hearing on the eyewitness identification claim in Appellant's petition for post-conviction relief. *Id.*

{¶7} In ordering the hearing, the Supreme Court made clear that its decision "focuse[d] on the standard for holding a hearing on a postconviction petition, not the standard for ultimately granting relief on the petition." *Id.* at ¶ 22. The Supreme Court further indicated that it "express[ed] no opinion on whether Bunch's claims might have merit once they are aired out in an evidentiary hearing." *Id.* at ¶ 51. Rather, the Supreme Court held, "[o]ur focus in this decision is not on the merits of Bunch's claim; instead, it is on the adequacy of the process leading up to a decision on Bunch's claim." *Id.*

{¶8} The trial court held a hearing on Appellant's post-conviction petition on September 5-6, 2023, and concluded with one additional day of testimony on January 11, 2024.

{¶9} At that hearing, defense counsel called two expert witnesses for testimony in support of the unreliability of eyewitness identification. The first witness, Dr. Margaret Bull Kovera, a social cognitive psychologist, identified nine characteristics she believed impair a witness's ability to identify a culprit's face, including: (1) stress; (2) the use of a weapon; (3) the lighting in the area; (4) the cross-racial nature of the parties; (5) a witness's poor ability to view the perpetrator; (6) contamination by post-event information; (7) repeated identifications that are contaminated by post-event information; (8) the suggestiveness of in-court identification; and (9) confidence in reliability of the witness's ability.

{¶10} Dr. Kovera opined that M.K.'s identification of Appellant was flawed since she was unable to initially identify him in a photo array provided by the police but only did so after seeing his photo in the newspaper. Dr. Kovera suggested the lighting in the area was poor, even though she admitted to not visiting the area nor checking the moon conditions. She had no way of knowing what the lighting conditions were at the time of the rape. Dr. Kovera stated that since there were at least two weapons present, this caused the victim to focus more on the weapons rather than on faces. Dr. Kovera believed that the stress of being raped, the fact that the victim was Caucasian and

Appellant is African American, and the limited exposure to his face since he wore a mask at times, also contributed to the victim being mistaken.

**{¶11}** On cross-examination, Dr. Kovera testified she did not know if M.K. actively attempted to rehearse details about faces as she did with the license plate. Dr. Kovera discounted the ability of a victim to identify a perpetrator by associating a body type to a face. She stated the identification of a person by body type would have to be independent of facial identification. She also admitted that different people react to stress differently and she could not know how M.K. would have reacted. Dr. Kovera additionally admitted she did not factor in the fact that the victim was able to correctly identify three other assailants where cross-racial identification was present. She had no way of saying that the result of the trial would have been different had she, or any other eyewitness expert, testified.

**{¶12}** Defense counsel then called Attorney Richard Koblentz to testify. Attorney Koblentz opined that the eyewitness identification was central to the defense. He believed the DNA exclusion of Appellant and the lack of any physical evidence to inculpate him. Although Callier added the detail that "Shorty Mack" was indeed Appellant, Attorney Koblentz did not think so. Attorney Koblentz cited several examples of Appellant's trial counsel, Attorney Dennis DiMartino, raising the defense of misidentification including in the opening statement, testimony of other prior bad acts, a Crim.R. 29 motion, his closing argument, and a lesser included jury instruction. Attorney Koblentz opined that if an expert witness on the issue of eyewitness identification had been used, it would have provided more credence to the issue of misidentification. He also believed that the failure to request the OJI instruction on eyewitness testimony was incompetent.

**{¶13}** Attorney Koblentz prepared a report which was admitted as Defendant's Exhibit Q. He also reviewed the affidavit and fee bill of Attorney DiMartino. DiMartino elected not to consult with an eyewitness identification expert and rather opted to rely on the cross-examination of M.K. Attorney Koblentz pointed out that Appellant's first trial counsel, Attorney Paul Conn, had requested money to consult with an eyewitness identification expert.

**{¶14}** On cross-examination, Attorney Koblentz agreed that the Supreme Court of Ohio ruled that Appellant was entitled to a new trial only if both prongs of *Strickland v. Washington*, 466 U.S. 668, were satisfied. He further conceded that Callier's testimony identifying Appellant as a rapist of M.K. was subject to cross-examination by each defense counsel. Attorney Koblentz also admitted he does not know what evidence the jury relied upon in convicting Appellant since there was not only the victim's testimony, but also the false statement of Appellant to the police, M.K.'s earring worn by Appellant, Callier's testimony, and the rest of the defense presented by Appellant.

**{¶15}** The State called DiMartino to testify. Attorney Conn was originally appointed to represent Appellant at trial but later withdrew. Thereafter, DiMartino was appointed and represented Appellant at trial. Attorney Conn and DiMartino discussed the strengths and weaknesses of the case against Appellant. DiMartino was aware that Attorney Conn was authorized by the trial court to receive $500 to hire an eyewitness identification expert. DiMartino was a very active criminal defense attorney. His license to practice law in Ohio was later suspended in 2016. His suspension, however, had no relation to his representation in the case at bar.

**{¶16}** DiMartino was familiar with eyewitness identification experts and consulted with them several times during his career. He believes that in some cases, experts can neutralize the State's case. DiMartino did not believe the use of an expert would be advantageous in the instant matter. He explained that given the deal made with one of the defendants, the surveillance video, Appellant lying to the police, M.K.'s earring worn by Appellant, and the identification by the witness, it would only infuriate the jury to bring in an expert to question a traumatized victim's identification. DiMartino explained his reasoning not to consult an expert was based upon trying 40 to 50 cases before a jury. He believed that applying too much pressure on sexual assault victims could result in the jury looking to convict regardless of the evidence. He maintained that an eyewitness identification expert would not have been helpful to the defense.

**{¶17}** DiMartino was aware of cross-racial identification but stated it is very speculative and felt like it would inflame the jury. DiMartino explained it was a bit too much to ask the jury to believe M.K. misidentified Appellant while she simultaneously properly identified all three co-defendants.

**{¶18}** DiMartino stated he knew that one of Appellant's co-defendants would end up testifying against Appellant and his instinct was correct. Jamar Callier testified at trial that Appellant raped M.K. Callier said Appellant was the driver of the black vehicle, Appellant fled on foot after the incident, and Appellant told the men to tell the police his name was "Shorty Mack." Callier also identified Appellant in still photographs that were captured by surveillance cameras at Dairy Mart.

**{¶19}** On cross-examination, DiMartino testified he believed he was able to establish the lack of Appellant's DNA in the rape kit without confronting the victim because he did not want the jury to think he was beating up on the victim. He explained that in his professional opinion, there is a balance between the amount of pressure used in cross-examination on a victim and the impression left on the jury.

**{¶20}** The State also called Attorney Mark Lavelle. The trial court qualified him as an expert over defense objection. Attorney Lavelle is a lawyer with 30 years of criminal defense experience. During his career, Attorney Lavelle has consulted with eyewitness identification experts. However, he has never felt the need to call one at trial. Attorney Lavelle opined that former Attorney DiMartino was not ineffective at Appellant's jury trial.

**{¶21}** Attorney Lavelle testified that although he may have tried the case differently, he did not believe DiMartino's efforts fell below the prevailing standard as it relates to providing representation. In his opinion, he would also not have utilized an expert to present to the jury that the victim made a mistake as it relates to identification, but rather, bolstered her testimony on the identification of the other three defendants and on the vehicle's license plate. He further explained that he would have cross-examined Detective Shuster on the photo array. However, he explained that you would end up with at least ten different opinions as to how to try this case if you asked ten different lawyers. Personally, Attorney Lavelle stated he too would not have called an eyewitness identification expert.

**{¶22}** Attorney Lavelle also testified that if you bring in an expert for something you can accomplish yourself, the jury might see it as excessive. He believed that an expert could have hurt the defense. When asked about aggressively cross-examining a victim, Attorney Lavelle stated he believes you have to be cautious in not allowing the

victim to appear like a victim again to the jury. In his experience, aggressively cross-examining a rape victim can cause a lawyer to lose the jury.

**{¶23}** On cross-examination, Attorney Lavelle testified that he believed Callier was useless in this case based on the Crim.R. 11 deal he made with the State. He believed DiMartino attempted to get the error in the victim's eyewitness identification out in cross-examining the victim but his attempts were unsuccessful. Attorney Lavelle opined that how DiMartino handled the victim, the sympathy she got from the jury, and the mood of the jury were all factors in the cross-examination of the victim. He believed it was a day-of-trial decision on how aggressively to pursue errors in eyewitness identification with the victim.

**{¶24}** Following the hearing, on February 12, 2024, the trial court found that Appellant's trial counsel was not ineffective in choosing not to call an eyewitness identification expert at the jury trial.

**{¶25}** Appellant filed the instant appeal, Case No. 24 MA 0030, and raises one assignment of error.

## ASSIGNMENT OF ERROR

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR POSTCONVICTION RELIEF WHEN APPELLANT ESTABLISHED THAT HIS TRIAL COUNSEL WAS INEFFECTIVE BECAUSE THE CORE OF APPELLANT'S DEFENSE TURNED ON EVIDENCE THAT CANNOT BE PROPERLY PROVIDED TO THE JURY WITHOUT THE USE OF EXPERT TESTIMONY AND THAT EXPERT TESTIMONY WAS AVAILABLE TO TRIAL COUNSEL WHO ADMITTEDLY KNEW OF THIS AND REFUSED TO USE IT.**

**{¶26}** In his sole assignment of error, Appellant argues the trial court abused its discretion in denying his petition for post-conviction relief following a hearing and asserts his trial counsel rendered ineffective assistance.

**{¶27}** Abuse of discretion is the proper standard for reviewing a trial court's ruling on a petition for post-conviction relief. *State v. Chapman*, 2020-Ohio-5589, ¶ 5 (7th Dist.),

citing *State v. Gondor*, 2006-Ohio-6679, ¶ 58. An abuse of discretion occurs when a court exercises its judgment "in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

> Post-conviction relief is a collateral civil attack on a criminal judgment. *State v. Steffen*, 70 Ohio St.3d 399, 410, 1994-Ohio-111, 639 N.E.2d 67. R.C. 2953.21 through R.C. 2953.23 govern petitions for post-conviction and provide that "any defendant who has been convicted of a criminal offense and who claims to have experienced a denial or infringement of his or her constitutional rights may petition the trial court to vacate or set aside the judgment and sentence." *State v. Martin*, 7th Dist. No. 12 MA 167, 2013-Ohio-2881, ¶ 13.

*Chapman*, 2020-Ohio-5589, at ¶ 5 (7th Dist.).

**{¶28}** Appellant claims his trial counsel was constitutionally ineffective in not employing an eyewitness identification expert.

**{¶29}** "(T)he Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial." *Strickland v. Washington*, 466 U.S. 668, 684, 104 S.Ct. 2052 (1984).

> In order to demonstrate ineffective assistance of counsel, Appellant must show that trial counsel's performance fell below an objective standard of reasonable representation, and prejudice arose from the deficient performance. *State v. Bradley*, 42 Ohio St.3d 136, 141-143, 538 N.E.2d 373 (1989), citing *Strickland* (*, supra*). Both prongs must be established: If counsel's performance was not deficient, then there is no need to review for prejudice. Likewise, without prejudice, counsel's performance need not be considered. *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000).

> In Ohio, a licensed attorney is presumed to be competent. *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999). In evaluating trial counsel's performance, appellate review is highly deferential as there is a

strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Bradley* at 142-143, citing *Strickland* at 689. Appellate courts are not permitted to second-guess the strategic decisions of trial counsel. *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995).

Even instances of debatable strategy very rarely constitute ineffective assistance of counsel. *See State v. Thompson*, 33 Ohio St.3d 1, 10, 514 N.E.2d 407 (1987). The United States Supreme Court has recognized that there are "countless ways to provide effective assistance in any given case." *Bradley* at 142, citing *Strickland* at 689.

To show prejudice, a defendant must prove his lawyer's deficient performance was so serious that there is a reasonable probability the result of the proceeding would have been different. *Carter* at 558. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Bradley*, 42 Ohio St.3d 136 at fn. 1, 538 N.E.2d 373, quoting *Strickland* at 693. Prejudice from defective representation justifies reversal only where the results were unreliable or the proceeding was fundamentally unfair as a result of the performance of trial counsel. *Carter*, 72 Ohio St.3d at 558, 651 N.E.2d 965, citing *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

. . .

[A]n ineffective assistance of counsel claim cannot be predicated upon supposition. *State v. Watkins*, 7th Dist. Jefferson No. 07 JE 54, 2008-Ohio-6634, ¶ 15. Likewise, proof of ineffective assistance of counsel requires more than vague speculations of prejudice. *Id.* ¶ 55, citing *State v. Otte*, 74 Ohio St.3d 555, 565, 1996-Ohio-108, 660 N.E.2d 711.

*State v. Rivers*, 2019-Ohio-2375, ¶ 20-23, 27 (7th Dist.).

Case No. 24 MA 0030

We thus refrain from second-guessing most of counsel's decisions on what questions to ask and what arguments to make. See *State v. Goodwin* (Sept. 24, 2001), 7th Dist. No. 99CA220, citing *State v. Carter* (1995), 72 Ohio St.3d 545, 558, 651 N.E.2d 965. A defendant is not guaranteed the right to the best counsel who presents a flawless trial performance. *Id.,* citing *State v. Burley* (Aug. 11, 1998), 7th Dist. No. 93CA204. Tactical omissions or debatable trial tactics are generally deemed matters of trial strategy rather than error. *State v. Clayton* (1980), 62 Ohio St.2d 45, 47, 402 N.E.2d 1189.

*State v. Baker*, 2003-Ohio-7008, ¶ 12 (7th Dist.).

**{¶30}** Regarding eyewitness identification, "[g]enerally, the decision not to call an expert witness does not constitute ineffective assistance of counsel because that decision is solely a matter of trial strategy." *State v. Tobert*, 2003-Ohio-675, ¶ 19 (1st Dist.), citing *State v. Coleman*, 45 Ohio St.3d 298, 307-308 (1989).

**{¶31}** The trial court was well within its discretion to deny Appellant's post-conviction petition as Appellant failed to show that his trial counsel's performance was deficient and further failed to show that he was prejudiced by counsel's decision not to employ an eyewitness identification expert. DiMartino's considered choice not to employ an eyewitness identification expert did not make his performance deficient under both prongs of *Strickland.*

**{¶32}** There exists no precedent that requires the use of an eyewitness identification expert. *See Horton v. Richard*, 2013 WL 5492337, *19 (S.D. Ohio Oct. 1, 2013) ("'No precedent establishes that defense counsel must call an expert witness about the problems with eyewitness testimony in identification cases or risk falling below the minimum requirements of the Sixth Amendment.'") (Internal citation omitted). Our Sister Court found that trial counsel was not ineffective in choosing not to employ an eyewitness identification expert as trial counsel thoroughly cross-examined the victims on their identification of the defendant. *State v. Horton*, 2011-Ohio-1387, ¶ 20 (10th Dist.). Similar to *Horton*, trial counsel here also thoroughly cross-examined the victim and continued to argue about misidentification throughout the trial.

**{¶33}** Appellant stresses that Dr. Kovera explained at the post-conviction hearing that M.K.'s eventual identification of him was contaminated by M.K.'s observations of Appellant on the news and that the identification was highly suggestive. Dr. Kovera relied on these conclusions when she claimed that an eyewitness expert's testimony could have impacted the outcome of the trial.

**{¶34}** In *State v. Knight*, 2024-Ohio-2176 (7th Dist.), the appellant claimed the trial court improperly barred his expert (Dr. Kovera) from offering an opinion as to the specific reasons why she thought a victim's identification of the appellant as the shooter was mistaken. *Id.* at ¶ 39-40, 112. Relying on the Supreme Court of Ohio's decision in *State v. Buell*, 22 Ohio St.3d 124 (1986), this court stated, "Evid.R. 702 did not allow a psychological expert to opine about the credibility of a specific eyewitness' identification testimony unless the eyewitness had a physical or mental impairment that may affect that witness' ability to observe or recall events." *Id.* at ¶ 115. This court found the appellant's assignment of error on that issue lacked merit. *Id.* at ¶ 121.

**{¶35}** Here, Dr. Kovera claimed at the post-conviction hearing that the outcome of the trial could have been different if an eyewitness identification expert had testified. However, Dr. Kovera's testimony relied upon information that she could not convey to a jury. Thus, Dr. Kovera's testimony cannot lend support to an argument that trial counsel rendered ineffective assistance by not calling her, or another expert, at the jury trial.

**{¶36}** Similarly, Attorney Koblentz claimed at the post-conviction hearing that an eyewitness identification expert should have been brought in to tell the jury that M.K.'s identification was not reliable. Like Dr. Kovera, Attorney Koblentz improperly believed that an expert could testify that M.K.'s identification was not reliable. *Knight* at ¶ 115; *State v. Patterson*, 2015-Ohio-873, ¶ 61 ("It is the factfinder, not an expert, who is properly charged with assessing the credibility or 'trustworthiness' of a witness.")

**{¶37}** The references by the Supreme Court of Ohio in *Bunch*, 2022-Ohio-4723, to *Hinton v. Alabama*, 571 U.S. 263 (2014) and *State v. Herring*, 2014-Ohio-5228, are only relevant to its finding that an evidentiary hearing was warranted.

**{¶38}** In *Hinton*, the United States Supreme Court held that "[u]nder that [*Strickland*] standard, it was unreasonable for Hinton's lawyer to fail to seek additional funds to hire an expert where that failure was based not on any strategic choice but on a

mistaken belief that available funding was capped at $1,000." *Hinton*, 571 U.S. at 273. Unlike *Hinton*, DiMartino made it clear that he was aware that funds were available and that he could request additional funds if he saw fit. However, DiMartino made a strategic choice not to employ an eyewitness identification expert in this case.

**{¶39}** In *Herring*, the defendant was part of a group of six that robbed an inn during which they shot five people, three of whom died. *Herring*, 2014-Ohio-5228, at ¶ 3. The defendant was convicted of three counts of complicity to commit aggravated murder, among other crimes, and was sentenced to death. *Id.* at ¶ 11. Subsequent post-conviction proceedings focused on the effectiveness of counsel during mitigation. *Id.* at ¶ 19. The defense's mitigation investigator revealed he did not have enough time to thoroughly investigate the case, did not know if defense counsel had the defendant examined by a psychologist, and in summary, that he had done a "substandard job of mitigation investigation." *Id.* at ¶ 36-38. On review by the Supreme Court of Ohio, it was determined that defense counsel assigned to represent capital defendants have a responsibility to ensure a thorough mitigation investigation was completed. *Id.* at ¶ 111. The Supreme Court concluded that due to the statements of the mitigation investigator and the evidence presented, trial counsel was ineffective. *Id.* at ¶ 111, 135. Thus, *Herring* did not and could not involve a strategic choice. Unlike *Herring*, DiMartino in the case at bar made a strategic choice after contemplating the use of an eyewitness identification expert.

**{¶40}** Appellant also stresses that he was excluded as the source of DNA in the rape kit. However, "physical evidence is not required to support a rape conviction against a manifest weight challenge." *State v. Thomas*, 2015-Ohio-5247, ¶ 31 (9th Dist.). Notwithstanding the DNA exclusion, the lack of eyewitness identification expert testimony, and the fact that M.K.'s identification of Appellant was delayed, the record establishes evidence of Appellant's guilt, as addressed, including: on August 21, 2001, around 10:20 p.m., M.K. arrived at work and noticed an older black automobile driving up the street and stopping a few houses away; she saw a tall masked man running through the grass (later identified as Brandon Moore); Moore pointed a gun at her and instructed her to give him all her money and belongings; Moore instructed M.K. to get into her vehicle; Moore climbed into her car and drove away with her inside; shortly thereafter, Moore

stopped the car and a second gunman (later identified as Appellant) exited the black vehicle and entered M.K.'s car; Appellant put a gun to M.K.'s head and demanded her money and belongings; Moore gave M.K.'s jewelry, including her earrings, to Appellant; both vehicles drove down a dead-end street and stopped; Appellant ordered M.K. out of the car and Moore and Appellant took turns orally, vaginally, and anally raping her; at some point, Andre Bundy (the driver of the other vehicle) told Jamar Callier (the passenger) to stop them; Callier then pushed Appellant off M.K., helped her to her feet, and put her in her vehicle; this caused an altercation between Appellant and Callier; prior to letting M.K. leave, Moore and Appellant threatened M.K. to not tell anyone what happened; M.K. drove straight to her boyfriend's parents' house where she screamed out the license plate number of the suspects' car; M.K.'s boyfriend's parents immediately took her to the hospital; Officer Lynch received information that M.K. had been raped by men in an older black vehicle with license plate No. "CTJ 6423"; M.K. gave a detailed description of the suspects and Officer Lynch broadcasted the information over the police radio; Officer Vitullo was on patrol and noticed a similar black vehicle/license plate number at Dairy Mart; Dairy Mart surveillance video captured Appellant and Callier inside the gas station; at trial, M.K. identified Appellant from the Dairy Mart video surveillance photographs; M.K. said Appellant was wearing her diamond earring; Officer Vitullo followed the car; the vehicle ran a stop signed and pulled in a driveway; the driver (Appellant) fled on foot while Moore, Bundy, and Callier were apprehended; before fleeing, Appellant told the men that he is not going back to jail and for them to tell the police his name is "Shorty Mack"; Callier verified that Appellant is "Shorty Mack"; Detective Shuster later learned that "Shorty Mack" is Appellant; Appellant was encountered by the police five minutes later and less than a half mile away; M.K.'s belongings and Appellant's .38 caliber handgun were found in the suspects' vehicle; three days later, Officer Jones was informed that the name of the rape suspect that fled was Appellant (Chaz Bunch), the individual he encountered outside of a home on Glenwood Avenue on the night of the rape; around this time, police stopped a vehicle in which they suspected Appellant was a passenger in the hopes of arresting him for these crimes; all four occupants, including Appellant, were wearing red bandanas; when stopped, Appellant told police his name was "Eric Coffer"; due to Appellant's past criminal record,

another officer recognized Appellant and arrested him; Callier admitted his involvement and testified at trial that both Moore and Appellant raped M.K.; M.K. accurately identified Moore, Bundy, and Callier; M.K. identified Appellant on multiple occasions, each time giving a consistent identification, since 2001; from the beginning, M.K. identified Appellant as one of the perpetrators that raped, robbed, and kidnapped her; M.K. described Appellant as shorter than her, heavier, darker skinned, chubby cheeks, cold looking eyes; M.K. also identified the .38 Smith & Wesson that Appellant had on his person that evening; M.K. was shown several photographic line-ups; she was drawn to No. 5 because of the cold looking eyes and the cheeks but requested a body shot; M.K. subsequently observed Appellant's photograph in a news article and immediately knew it was one of the men that raped her; M.K. said she could never forget a body that was on top of her and looking at her in the eyes while raping her; M.K. gave a consistent account of the events and of her identification of Appellant at the probable cause hearing and at the suppression hearing; M.K. testified and identified Appellant in the courtroom at the jury trial; and at the re-sentencing hearing on September 6, 2019, about 18 years later, M.K. emphatically reiterated that Appellant raped, robbed, and kidnapped her.

**{¶41}** DiMartino successfully convinced the jury to acquit Appellant of the aggravated robberies involving other victims, Cosa and Hammond, which took place right before the incident involving M.K. However, given the overwhelming evidence against Appellant regarding M.K., as addressed, any deficiency in trial counsel's performance does not allow for reversal on a claim of ineffective assistance of counsel. *See State v. Grate*, 2020-Ohio-5584, ¶ 137; *State v. Clinton*, 2017-Ohio-9423, ¶ 41.

**{¶42}** Upon consideration, the trial court did not abuse its discretion in denying Appellant's petition for post-conviction relief following a hearing. The record establishes trial counsel's representation was constitutionally effective and Appellant did not suffer prejudice. Appellant fails to demonstrate ineffective assistance of counsel under *Strickland*.

**CONCLUSION**

**{¶43}** For the foregoing reasons, Appellant's sole assignment of error is not well-taken. The February 12, 2024 judgment of the Mahoning County Court of Common Pleas is affirmed.

Robb, P.J., concurs.

Hanni, J., concurs.

---

For the reasons stated in the Opinion rendered herein, the assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed. Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**