OPINION
{¶ 1} Appellant Michael Eason is hereby appealing his conviction for felonious assault in the Belmont County Court of Common Pleas. Appellant contends that the prosecutor made improper comments at trial concerning Appellant's refusal to cooperate in the police investigation. It is clear from the record that Appellant's counsel was responsible for making an issue of Appellant's silence as a part of his trial strategy, and we find no error in the manner in which the prosecutor referred to that silence during trial. We also conclude that the trial judge properly allowed the prosecutor to impeach one of his own witnesses, and we reject Appellant's claim of ineffective assistance of counsel. For the reasons discussed below, we affirm Appellant's conviction.
 {¶ 2} On January 6, 2002, Appellant was serving a prison term in the Belmont Correctional Institution ("BCI"). Appellant and inmate Matthew Neuch ("Neuch") were involved in an argument during a card game. (Tr., p. 59.) The argument escalated into a fight. Corrections officers arrived at the fight scene as they were investigating a report that a clothes iron had been stolen from one of the inmates. (Tr., p. 208.) Officer Michael Dutcher found Appellant standing over Neuch, choking him with a jacket that was pulled over Neuch's head. (Tr., p. 209.) Officer Dutcher later found the clothes iron about fifty feet away from where the fight had taken place. (Tr., p. 210.) Ten minutes after the fight, Neuch told the prison nurse that he had been hit in the forehead and behind the right ear with a clothes iron, and that he had been burned on both arms by the iron. (Tr., p. 218.) The nurse at BCI confirmed that Neuch had first and second degree burns on his arms and chest that looked as if they had been made by a clothes iron. (Tr., p. 224.)
 {¶ 3} Neuch identified Appellant as the individual who assaulted him. (Tr., p. 142.)
 {¶ 4} On March 6, 2002, Appellant was indicted on one count of felonious assault in violation of R.C. 2903.11(A)(2), a second degree felony, which states:
 {¶ 5} "(A) No person shall knowingly do either of the following:
 {¶ 6} "* * *
 {¶ 7} "(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."
 {¶ 8} The matter proceeded to jury trial on June 25 and 26, 2002. Various inmates testified at trial. Inmate Joseph Regoni testified that he was ironing his prison clothes on the evening of the assault, and that a tall black inmate took the iron, walked to the back room and hit somebody with the iron. (Tr., pp. 34-35.)
 {¶ 9} Inmate Antonio Alexander testified that he was part of a card game that night involving Appellant and Neuch. (Tr., p. 58.) Inmate Alexander testified that Appellant and Neuch engaged in a heated argument during the game because Neuch was standing up and possibly looking at the other player's cards during the game. (Tr., pp. 60, 62.) He also testified that there were no other card games going on at the time, and that the only argument that took place was between Appellant and Neuch. (Tr., p. 61.) Inmate Alexander did not see the fight because he left to use the bathroom, but he did see Appellant walk away from the card game. (Tr., p. 62.)
 {¶ 10} Officer Dutcher testified that he went to the back room to investigate a report that someone had taken an iron from one of the inmates. (Tr., p. 208.) When Officer Dutcher arrived, he saw Appellant standing over and choking Neuch. (Tr., p. 209.) The officer ordered Appellant to let Neuch go, but Appellant refused. (Tr., p. 211.) Officer Dutcher and another officer had to forcibly stop Appellant from choking Neuch. (Tr., p. 211.) Officer Dutcher later found the iron after the fight was over. (Tr., p. 210.)
 {¶ 11} State Highway Patrol Trooper Dale Campbell testified that he investigated the assault. (Tr., p. 240.) Trooper Campbell testified that he interviewed inmate Brad Ladd and that inmate Ladd gave a three-page statement concerning the assault. (Tr., p. 243.) Inmate Ladd told Trooper Campbell that Appellant left the card game, came back with an iron, hit Neuch in the head with the iron a number of times, wrapped the cord around Neuch's neck, and then wrapped a jacket around Neuch's neck. (Tr., pp. 248-249.)
 {¶ 12} Trooper Campbell also testified that Appellant fit the description he had been given of the aggressor in the assault. (Tr., pp. 266-267.)
 {¶ 13} The victim, inmate Neuch, also testified at trial. He testified that he was watching television and then walked over to the card game. (Tr., p. 139.) He did not see any chairs, so he stood watching the game. (Tr., p. 139.) Neuch testified that Appellant told him to go get a chair, and Neuch said "[t]here is none." (Tr., p. 139.) They started arguing, and Appellant said, "I'm going to do something to you." (Tr., p. 140.) Shortly afterward, Appellant left the table, and Neuch sat down at the card game. (Tr., p. 141.) Neuch testified that two or three minutes later Appellant returned and hit him in the back of the head with something, causing him to fall to the floor. (Tr., p. 141.) Neuch testified that, "[a]s I'm getting up, I look him dead square in the face and he plasters me right between my eyes with the iron." (Tr., p. 141.)
 {¶ 14} Inmate Ladd was called to testify at trial. He initially refused to testify, but then answered the questions put to him. (Tr., pp. 78ff.) Inmate Ladd testified that Trooper Campbell had accurately recorded his prior statement, but that he did not actually observe all the events he had described to Trooper Campbell. Inmate Ladd testified that he saw Appellant leave the card game and come back with an iron, but that he did not actually see Appellant hit Neuch with the iron. (Tr., pp. 91, 93.)
 {¶ 15} Robin Roggenbeck of the Bureau of Criminal Identification and Investigation testified that there were no identifiable fingerprints on the iron. (Tr., p. 182.)
 {¶ 16} Inmate Rodney Stefek testified about certain statements inmate Ladd made while the two were incarcerated near each other. Ladd allegedly told Stefek that he falsely implicated Appellant in the assault. (Tr., p. 192.) According to Stefek, inmate Ladd did not see the fight but blamed Appellant for the assault to, "get him out of the way so he didn't have to pay the poker debt he owed him." (Tr., p. 192.)
 {¶ 17} Appellant testified in his own defense at trial. He admitted to exchanging punches with Neuch, but denied having an iron. (Tr., pp. 301-302.) He testified that another person had the iron, swung it at Appellant, but hit Neuch instead. (Tr., p. 302.) Appellant testified that the iron fell, and that Neuch picked it up and hit Appellant in the leg with it. (Tr., p. 302.) The two of them then "started tussling" with the iron, resulting in Neuch receiving a burn on his arm. (Tr., pp. 302-303.) Appellant denied wrapping the iron cord around Neuch's neck. (Tr., p. 304.)
 {¶ 18} After hearing all the evidence, the jury found Appellant guilty of felonious assault. The sentencing hearing was held on July 17, 2002. The court sentenced Appellant to seven years in prison, to be served consecutively to the prison term that Appellant was presently serving. (7/18/02 J.E.) On July 26, 2002, Appellant filed this appeal.
 {¶ 19} Appellant's first assignment of error asserts:
 {¶ 20} "The trial court erred by admitting evidence regarding the defendant's silence during the State of Ohio's case and closing arguments."
 {¶ 21} During the course of the trial, the investigating officer, Trooper Campbell, testified that he, "tried speaking to the Defendant." (Tr., p. 257.) Trooper Campbell also noted that Appellant, "wasn't very cooperative," and testified that, "when I tried to meet with the Defendant on January the 8th, he refused." (Tr., pp. 260, 261.)
 {¶ 22} Appellant argues that he was forced to take the stand in his own defense to rebut the comments made by Trooper Campbell. Appellant contends that the prosecutor questioned him about his refusal to talk and commented on it during closing argument. Appellant believes that Trooper Campbell's testimony, along with the prosecutor's questions and closing arguments, violated his right to remain silent as stated in Miranda v.Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.
 {¶ 23} Although Appellant does not cite to any more specific caselaw, it is evident that he is relying on Doyle v. Ohio (1976),426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91, which held that the state, after giving a defendant Miranda warnings, cannot use the defendant's post-arrest silence as a means to impeach the defendant if he or she later decides to testify at trial. Id. at 618, 96 S.Ct. 2240, 49 L.Ed.2d 91.Doyle involved two defendants who were given Miranda warnings and then remained silent about their involvement in the crime. Each testified at trial that he had been framed. On cross-examination, the prosecutor attempted to impeach the defendants by asking them why they had not told their version of the story to the police.
 {¶ 24} Doyle held that:
 {¶ 25} "[W]hile it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." Id.
 {¶ 26} The record reflects that Appellant refused to sign a waiver of his Miranda rights, refused to talk to Trooper Campbell, and asked for an attorney. (Tr., pp. 321-322.) The record also reflects that the state's prosecuting attorney questioned Appellant on cross-examination about his post-arrest silence. (Tr., pp. 318-322.) Without more, this case does appear at first blush to raise the same types of issues addressed in Doyle.
 {¶ 27} A closer look, though, at the trial transcript reveals that Appellant's counsel clearly waived any right to have Appellant's post-arrest silence kept out of trial because Appellant's counsel himself raised the issue and used Appellant's silence as a material fact in the case. In Anderson v. Charles, a post-Doyle case, the United States Supreme Court held that a defendant who voluntarily takes the witness stand waives the right to remain silent about the testimony he gives, including testimony about the defendant's prior silence:
 {¶ 28} "Doyle bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. But Doyle does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all. See UnitedStates v. Agee, 597 F.2d 350, 354-356 (CA3) (en banc), cert. denied,442 U.S. 944 (1979); United States v. Mireles, 570 F.2d 1287, 1291-1293
(CA5 1978); United States v. Goldman, 563 F.2d 501, 503-504 (CA1 1977), cert. denied, 434 U.S. 1067 (1978)." Anderson v. Charles (1980),447 U.S. 404, 408, 100 S.Ct. 2180, 65 L.Ed.2d 222.
 {¶ 29} Ohio courts have agreed that a prosecutor may question a defendant about post-arrest silence, without a Doyle violation, if the defendant has raised the issue on direct examination. State v. Covender
(Dec. 24, 1997), 9th Dist. No. 96CA006457; State v. Miller (1988),44 Ohio App.3d 42, 46, 541 N.E.2d 105; State v. Vaughn (July 11, 1985), 8th Dist. No. 49272.
 {¶ 30} "Post-arrest silence is inadmissible in the great majority of cases as being nonprobative of a defendant's guilt. Doyle v. Ohio
(1976), 426 U.S. 610. However, if defense counsel opens the subject area in direct examination, it is not improper for the prosecutor to cross-examine the defendant on the same matter." State v. Holland (Oct. 25, 1984), 8th Dist. Nos. 47923, 47924.
 {¶ 31} It is clear from the record that it was Appellant's counsel, rather than the prosecutor, who initially questioned Trooper Campbell about Appellant's post-arrest silence. (Tr., pp. 257, 261.) The prosecutor did not initially question Trooper Campbell at all about Appellant's post-arrest silence. Appellant's counsel decided to call Appellant as a witness. Appellant's counsel questioned him extensively about the events of January 6, 2002, and then asked:
 {¶ 32} "Q. Okay. Did anybody from the prison try to ask you what happened here?"
 {¶ 33} "A. Nobody but the state trooper.
 {¶ 34} "Q. That was the first individual?
 {¶ 35} "A. That was it.
 {¶ 36} "Q. Any of the guards try to question you to see if this was your fault or inmate Neuch's fault?
 {¶ 37} "A. No, they didn't — oh, Tammy, I had the investigation with the Tammy, with the inspector, that was it. The Tammy Bober.
 {¶ 38} "* * *
 {¶ 39} "Q. Did you offer her any indication as to what had happened?
 {¶ 40} "A. I just told her I was just defending myself, that was it.
 {¶ 41} "Q. Did you make any admissions to anyone that you brought this iron to the fight?
 {¶ 42} "A. No, I didn't.
 {¶ 43} "Q. Do you remember what you told Mrs. Bober?
 {¶ 44} "A. Basically, I told her nothing.
 {¶ 45} "Q. I mean, did you tell her there was an argument?
 {¶ 46} "A. Yea." (Tr., pp. 305-306.)
 {¶ 47} At this point the testimony took a different direction, but Attorney Berhalter soon resumed his line of questioning about the people Appellant had spoken to in prison regarding the assault:
 {¶ 48} "Q. (BY APPELLANT'S COUNSEL) Did you have an opportunity at any time to tell an investigator or prison officials as to who was playing cards at this table?
 {¶ 49} "A. No.
 {¶ 50} "Q. Now, I said opportunity, did anyone ask you?
 {¶ 51} "A. No, they didn't.
 {¶ 52} "Q. Now, you've heard Trooper Campbell state that he went to interview you and you refused to talk him [sic]; is that correct?
 {¶ 53} "A. That's correct.
 {¶ 54} "Q. Can you tell the jury why?
 {¶ 55} "A. Because these are my exact words, when he came to me and stated to me that I was being charged with an outside case, and I asked him, `Just for a fist fight?' And he said it goes beyond more than that. I said these exact words, `If you're going to charge me with outside case, I would like to see a lawyer.'
 {¶ 56} "Q. Was that the extent of your interview with him?
 {¶ 57} "A. That was the extent with any interviews, period." (Tr., p. 311.)
 {¶ 58} The strategy of Appellant's counsel was apparently to raise doubts about whether BCI took any serious steps to obtain Appellant's interpretation of the events that occurred on January 6, 2002. Appellant's answers raised questions about Trooper Campbell's veracity and about whether Appellant was being railroaded by the state.
 {¶ 59} The prosecutor then cross-examined Appellant concerning the issues raised in Appellant's direct examination. The following exchange took place between the prosecutor and Appellant:
 {¶ 60} "Q. Now, you indicated in some of Mr. Berhalter's [Appellant's counsel] questioning, as I recall, the theme — the theme I took from it was that before charges were actually filed against you, the penitentiary, nor anyone associated with the penitentiary, attempted to find out exactly what happened?
 {¶ 61} "A. Exactly.
 {¶ 62} "Q. Is that your belief?
 {¶ 63} "A. Only visit that I had was with the inspector in the institution and then State Patrol.
 {¶ 64} "Q. When, in fact, on January 8ht [sic], two days after the incident, they came to talk to you, did they not?
 {¶ 65} "A. Who came to talk to me?
 {¶ 66} "Q. The trooper.
 {¶ 67} "A. Yea.
 {¶ 68} "Q. Okay. And your initial response when they came to talk to you was — now, you're in segregation at that time; correct?
 {¶ 69} "A. Hm-hmm.
 {¶ 70} "Q. Is that correct?
 {¶ 71} "A. Yes, sir.
 {¶ 72} "Q. Your initial response to them was that you even refused to come from segregation to talk to them.
 {¶ 73} "A. No, that wasn't it. The officer came to my cell and I was asleep —
 {¶ 74} "Q. All right.
 {¶ 75} "A. And he told me — could I answer your question?
 {¶ 76} "Q. Yea, go ahead.
 {¶ 77} "A. And he told me that the State Patrol was there and I'm getting out of bed and brushing my teeth and he just walks away from the door and tells the State Patrol I don't want to see him. So the State Patrol comes to the door and asks me did I — `You don't want to talk to me?'
 {¶ 78} "I said, `Yea, I want to talk you' [sic].
 {¶ 79} "And that's when he brought me out the cell and he took me elsewhere.
 {¶ 80} "* * *
 {¶ 81} "Q. [PROSECUTOR] Is it not a fact that initially when you were advised that someone wanted to talk to you, that you just absolutely refused to come out of your segregation cell to talk to the representative from the State Patrol?
 {¶ 82} "A. No.
 {¶ 83} "* * *
 {¶ 84} "Q. [PROSECUTOR] And is it not a fact that after that occurred that the trooper did, in fact, come to your segregation cell to talk to you?
 {¶ 85} "A. Yes.
 {¶ 86} "* * *
 {¶ 87} "Q. So it's not true that the prison didn't make any attempt to find out what was going on, they, in fact, did. You simply didn't want to cooperate?
 {¶ 88} "A. I never said that. I said that they came to — the officer came to the door and said — and just came to the door and said, `Get dressed, Eason.' And I get up to brush my teeth and he walks away. I never said that.
 {¶ 89} "Q. Did you not respond to Mr. Berhalter and tell him that the prison made no attempt to find out what happened?
 {¶ 90} "A. I never said that. I said the officer — I had two visits with the institution inspector and also the State Patrol.
 {¶ 91} "Q. Well, at the very least, you don't deny the State Patrol tried to talk to you in the cell?
 {¶ 92} "A. No, no.
 {¶ 93} "Q. Right. In other words, that's a correct statement?
 {¶ 94} "A. Pardon me?
 {¶ 95} "Q. That's a correct statement, you refused to talk to them?
 {¶ 96} "A. No, I did not refuse to talk to him. He know I did not refuse to talk to him. He took me out the cell to talk to me.
 {¶ 97} "Q. But the comment * * * `If this is an outside case, I want a lawyer.' Did you make that comment to him?
 {¶ 98} "A. Okay, in order for me the [sic] make that comment, I had to talk to him; right?
 {¶ 99} "Q. Okay. So you talked to him up to the point that you determined this was an outside case?
 {¶ 100} "A. Exactly.
 {¶ 101} "Q. And then you refused to give him any facts, your version of the facts?
 {¶ 102} "A. Exactly.
 {¶ 103} "Q. So at least, to that extent, then, the prison was attempting to find out what happened on January 6th?
 {¶ 104} "A. I never stated that they didn't." (Tr., pp. 318-323.)
 {¶ 105} It is clear from the quoted portions of the transcript that Appellant waived his right to remain silent as well as the right to prevent the state from referring to that silence, because Appellant himself introduced the post-arrest silence into evidence and used it as part of his defense. Appellant, at least initially, attempted to show that he was denied an opportunity to explain his version of the story. The prosecutor's line of questioning clarified that the state did try to get Appellant's side of the story, but that Appellant refused to talk with Trooper Campbell and then asked for an attorney.
 {¶ 106} Appellant's counsel was responsible for initiating any discussion of Appellant's post-arrest silence. Appellant's counsel also called Appellant as a witness to further delve into his post-arrest silence. Moreover, Appellant attempted to use his post-arrest silence as a means to discredit the prosecution. It was only after Appellant raised these issues that the prosecutor questioned Appellant about inconsistencies in his testimony concerning his post-arrest silence.
 {¶ 107} The prosecutor also summarized his line of questioning in closing argument:
 {¶ 108} "The only one whose [sic] been inconsistent is Mr. Eason [Appellant]. Now, this investigation was done in January, you heard the testimony and, that is, that the trooper went in with an open mind, wanted to talk to anybody and everybody who knew anything about the fight.
 {¶ 109} "Admittedly, I'm sure there are plenty out there who knew about it and could testify, and they simply chose not to whether we like it or not. But the fact is this defendant was given the opportunity to give his version of what happened when the investigation started. You read into that what you want, but the fact is he sat up here initially in response to Mr. Berhalter's questions, `Did the prison do anything in attempt to identify who did it?' He said, `No,' or something along those lines, that's my recollection.
 {¶ 110} "Yet, when he was contacted, I believe, on January 7th, the day after the accident, he initially refused to come out of his cell at all, the officer had to go back to talk him [sic]. And as soon as he found out it was an outside case, he said, `I want a lawyer.' And he made no attempt, no attempt whatsoever to explain what happened on January 6th, other than coming into this courtroom today and wanting you to buy off on the theory that somebody else swung this iron." (Tr., pp. 356-357.)
 {¶ 111} The prosecutor's comments fall outside the realm of Doyle.
The state cannot be expected to forego commenting on a defendant's post-arrest silence when the defendant himself testifies about that silence as part of his defense. For these reasons, we overrule Appellant's first assignment of error.
 {¶ 112} Appellant's second assignment of error states:
 {¶ 113} "The trial court erred by admitting hearsay evidence during the State of Ohio's case, including admission over the defendant's objections."
 {¶ 114} This assignment of error relates to inmate Ladd's eyewitness testimony. Ladd had given a statement to Trooper Campbell about the assault, and the state intended to call him as a witness to testify in conformity with the prior statement. The written statement recorded a series of questions posed by Trooper Campbell and inmate Ladd's answers.
 {¶ 115} A few days prior to trial, inmate Ladd said that he did not want to testify. (Tr., p. 103.) Ladd did not indicate that he was planning to change or recant his prior written statement. (Tr., p. 103.) At trial, though, it became evident that Ladd's written statement did not accurately reflect that it contained some hearsay comments from other inmates rather than being solely a record of his own observations. (Tr., p. 83.)
 {¶ 116} The prosecutor questioned Ladd as if on cross-examination, reading from the prior statement and asking Ladd if each question and corresponding answer were accurate. Ladd stated a number of times that particular answers were not accurate because they were based on what others told him rather than on his own observations. (Tr., pp. 86 ff.) For example, Ladd did not see Appellant hit the victim with an iron, contradicting what Ladd had earlier told Trooper Campbell. (Tr., p. 88.)
 {¶ 117} Appellant's counsel eventually objected that the state was introducing hearsay statements into the record. (Tr., p. 100.) The trial court determined that the state's line of questioning could continue, but only after inmate Ladd read each question and corresponding answer silently to himself, and then confirmed to the court that he actually observed the events or facts contained in his written answer. (Tr., p. 106.) Appellant's counsel did not raise any further objections to Ladd's testimony.
 {¶ 118} Appellant now argues on appeal that the trial court should have prohibited the prosecutor from asking Ladd whether particular facts in the prior written statement were based on what others had told him rather than personal observation. Appellant believes that the trial court allowed inadmissible hearsay to be introduced into the record during this line of questioning. Hearsay refers to second-hand factual assertions, i.e., statements made outside the courtroom that are presented to the jury as factually accurate and truthful. Evid.R. 801(C). Hearsay is generally inadmissible, although there are numerous exceptions to the hearsay rule. Evid.R. 802 ff.
 {¶ 119} "The admission of evidence lies within the broad discretion of a trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice." State v. Noling, 98 Ohio St.3d 44, 2002-Ohio-7044,781 N.E.2d 88, ¶ 43.
 {¶ 120} It is clear from the record that inmate Ladd did refer to hearsay statements a number of times while being questioned by the prosecutor. (Tr., pp. 86-100.) Nevertheless, Appellant does not point to any specific hearsay rule that has been violated. Appellant does discuss Evid.R. 607(A), which states:
 {¶ 121} "(A) Who may impeach
 {¶ 122} "The credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage. This exception does not apply to statements admitted pursuant to Evid. R. 801(D)(1)(a), 801(D)(2), or 803."
 {¶ 123} Evid.R. 607 only allows a party to impeach its own witness with a prior inconsistent statement if the party can show "surprise and affirmative damage." Without this requirement, a party could call a witness solely for the purpose of exposing the jury to inadmissible hearsay in the form of prior inconsistent statements made by that witness. State v. Lewis (1991), 75 Ohio App.3d 689, 695, 600 N.E.2d 764.
 {¶ 124} "The element of surprise is proved when the testimony is materially inconsistent with the prior statement and counsel did not have reason to believe that the witness would change his or her testimony."State v. Hubbard, 150 Ohio App.3d 623, 2002-Ohio-6904, 782 N.E.2d 674, ¶ 10.
 {¶ 125} The trial court ruled that the state was surprised by Ladd's testimony and would have been prejudiced without the admission of the evidence of Ladd's former written statement. (Tr., p. 275.) The record reflects that the state did not know that inmate Ladd would be recanting part of his testimony, although it was known that Ladd was reluctant to testify. (Tr., p. 103.) Given the state's reasonable explanation as to why it was surprised by Ladd's testimony, the trial court did not abuse its discretion in allowing the prosecutor to impeach part of Ladd's testimony. Appellant's second assignment of error is hereby overruled.
 {¶ 126} Appellant's third assignment of error asserts:
 {¶ 127} "The appellant was denied effective assistance of counsel in violation of the fifth, sixth and fourteenth amendments of the United States Constitution, which, in turn, denied the appellant a fair trial."
 {¶ 128} Appellant believes that his counsel was ineffective for failing to object to the prosecutor's allegedly improper reference to Appellant's silence and counsel's failure to object to the hearsay testimony of inmate Ladd.
 {¶ 129} In order to prevail on an ineffective assistance of counsel claim, a defendant must satisfy the two-part test set forth in Stricklandv. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. First, a defendant must show that counsel's performance was deficient. To meet that requirement, a defendant must show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. In other words, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. Id. at 690,104 S.Ct. 2052, 80 L.Ed.2d 674.
 {¶ 130} Second, that the deficient performance must have prejudiced the defense so as to deprive the defendant of a fair trial, i.e., a trial that resulted in a reliable verdict. Id. at 687, 104 S.Ct. 2052,80 L.Ed.2d 674. A defendant must show that, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674.
 {¶ 131} A properly licensed attorney is presumed to be competent.Vaughn v. Maxwell (1965), 2 Ohio St.2d 299, 301, 31 O.O.2d 567,209 N.E.2d 164. There is, "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *."State v. Bradley (1989), 42 Ohio St.3d 136, 142, 538 N.E.2d 373, quotingStrickland at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.
 {¶ 132} The right to effective assistance of counsel is not a guarantee of a favorable outcome at trial. State v. Longo (1982),4 Ohio App.3d 136, 139, 4 OBR 228, 446 N.E.2d 1145. "A failure to prevail at trial does not grant an appellant license to appeal the professional judgment and tactics of his trial attorney." State v. Hart (1988),57 Ohio App.3d 4, 10, 566 N.E.2d 174. Reviewing courts are not at liberty to second-guess trial strategy, and must keep in mind that one attorney will defend the case differently than another attorney. Strickland at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674; see also Yarborough v. Gentry
(2003), 540 U.S. ___.
 {¶ 133} Counsel's representation was not unconstitutionally deficient in this case. His trial strategy appeared to be to raise the issue of Appellant's post-arrest silence as a way to discredit the state's investigation and to impeach Trooper Campbell. Appellant's counsel did not object to the prosecutor's comments about the post-arrest silence because counsel himself raised the issue at trial. As far as the hearsay evidence is concerned, it also appears to have been a trial strategy to allow the prosecutor to discredit its own witness, i.e., inmate Ladd, by references to hearsay. If inmate Ladd testified in conformity with his prior statement to the police, the testimony would have indicated that inmate Ladd saw Appellant holding the iron. As it actually unfolded at trial, inmate Ladd made it clear that certain aspects of his prior statement were only stories told to him by other inmates. This revelation may have tended to discredit inmate Ladd's entire testimony, and it is not an unreasonable trial strategy to allow the prosecutor to undermine his own witness. Appellant's counsel did eventually object, but only after it was clear that inmate Ladd had not actually seen some of the crucial facts that were in his prior statement. When Appellant's counsel cross-examined Ladd, he reiterated the fact that Ladd's prior statement to police was based on hearsay. (Tr., pp. 121-122.)
 {¶ 134} It is not our place to second-guess counsel's trial strategy, and his representation in this case was within an acceptable range of reasonable representation. We hereby overrule Appellant's third assignment of error.
 {¶ 135} Having overruled all three of Appellant's assignments of error, we now affirm the judgment of the trial court in full.
Judgment affirmed.
Vukovich, J., concurs.
DeGenaro, J., dissents; see dissenting opinion.