[Cite as *State v. Linde*, 2025-Ohio-5209.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## BELMONT COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

ROBERT CHARLES LINDE,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 25 BE 0016**

---

Criminal Appeal from the
Court of Common Pleas of Belmont County, Ohio
Case No. 24 CR 179

**BEFORE:**
Katelyn Dickey, Carol Ann Robb, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. J. Kevin Flanagan,* Belmont County Prosecutor, and *Atty. Jacob A. Manning*, Assistant Prosecuting Attorney, for Plaintiff-Appellee and

*Atty. Rhys B. Cartwright-Jones*, for Defendant-Appellant.


Dated:  November 10, 2025

**DICKEY, J.**

{¶1} Appellant, Robert Charles Linde, appeals from the April 30, 2025 judgment of the Belmont County Court of Common Pleas convicting him for aggravated arson and aggravated menacing and sentencing him to 10 to 14 years in prison following a jury trial. On appeal, Appellant raises arguments involving ineffective assistance of counsel and sufficiency of the evidence. Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

{¶2} On August 8, 2024, Appellant was indicted by the Belmont County Grand Jury on four counts: count one, aggravated arson, a felony of the first degree in violation of R.C. 2909.02(A)(1) and (B)(2); count two, aggravated arson, a felony of the second degree in violation of R.C. 2909.02(A)(2) and (B)(3); count three, aggravated menacing, a misdemeanor of the first degree in violation of R.C. 2903.21(A) and (B); and count four, domestic violence, a misdemeanor of the first degree in violation of R.C. 2919.25(A) and (D)(2). Appellant was appointed counsel at his arraignment and bond was set.

{¶3} On September 26, 2024, Appellant filed a "Plea of Not Guilty by Reason of Insanity and Suggestion of Incompetence." The trial court ordered an evaluation the next day. On November 26, 2024, the court received a report from the examiner opining that Appellant did not exhibit signs of a mental disease or defect at the time of the alleged crimes and was capable of understanding and participating in his defense. The court scheduled a further sanity/competency hearing for December 2, 2024. At that hearing, Appellant requested a second opinion. Appellant also filed a written "Request for Second Evaluation for Insanity and Competence" on December 10, 2024.

{¶4} On February 18, 2025, the trial court received the second opinion which agreed with the first, i.e., that Appellant did not exhibit signs of a mental disease or defect at the time of the alleged crimes and was capable of understanding and participating in his defense. On February 25, 2025, the court found Appellant to have been sane at the time of the alleged crimes and now competent to stand trial.

{¶5} The trial court set the case for trial. New counsel was appointed to represent Appellant because his prior counsel was permitted to withdraw. At a hearing

held on March 17, 2025, the court denied a request from Appellant to have new counsel appointed again.

{¶6} A jury trial commenced on April 1, 2025. Numerous exhibits were admitted into evidence and Appellee, the State of Ohio, presented four witnesses: (1) S.E. ("the victim"), Appellant's fiancé; (2) Dan Columbo ("Columbo"), a handyman; (3) Henry Sam Martin ("Officer Martin"), an officer with the Bellaire Police Department; and (4) Kenneth Wright ("Investigator Wright"), an investigator with the State Fire Marshal's Office.

{¶7} Appellant and the victim were living together in a triplex apartment building located at 3624 Noble Street, Apartment A, Bellaire, Belmont County, Ohio 43906. The couple had an argument on July 25, 2024. The victim's statement to police indicated that on that date, she and Appellant "got into an argument" and "[Appellant] told [her] to leave his house" after which they exchanged words. (4/1/2025 Jury Trial Tr., p. 388). When she returned, they laid down in the bedroom where Appellant was playing with his lighter. Because Appellant's lighter was out of butane, he took hers. The victim tried to take the lighter back from Appellant. Appellant "[s]aid he was going to catch the blanket on fire" "[a]nd he did." (*Id.* at p. 389). The two were next to each other on the bed when it occurred. According to the victim's statement, Appellant already "made his usual threat" which was to "cut [her] throat." (*Id.* at p. 392). The victim indicated she was "hysterical" and that Appellant "really scared the hell out of [her]." (*Id.* at p. 393).

{¶8} The victim got up after the blanket caught fire. Appellant followed her. The victim indicated that Appellant wanted her to help put out the fire, but it was too late. The victim went downstairs to tell the neighbors to get out of the building because of the fire. A caller reported flames in the upstairs unit. When the victim went outside, Appellant's truck was gone. Appellant never contacted the victim again.

{¶9} Columbo worked as a handyman assisting the landlord of the apartment building at issue. Columbo saw "black smoke just billowing out the back window" and yelled, "Fire. Place on fire." (*Id.* at p. 422). Columbo ran upstairs which was "just full of smoke[.]" (*Id.* at p. 423).

{¶10} Officer Martin testified that when he arrived, the smoke was "heavy[,]" and it affected his eyes and lungs. (*Id.* at p. 437). He turned around once he reached the

apartment where the fire was. On Officer Martin's body camera, the victim was heard describing that Appellant had gotten "a new straight razor" that same day. (*Id.* at p. 399).

{¶11} Investigator Wright is an expert in arson investigation. He saw fire damage increasing in severity directionally towards the bed. Investigator Wright noticed burnt fabric and annealed springs. At the location of the bed, he also noticed clean burn indicating that the fire was hot enough by the bed to burn the soot away from the surface. He opined the fire was started by using a lighter to light bedding on fire. Investigator Wright knew from experience that "an open flame can ignite bedding." (*Id.* at p. 483). He testified that a lit cigarette could start a fire, but it will do so "very slow" and it would "smolder for a while." (*Id.* at p. 485). Investigator Wright stated that this fire "was too rapid of a fire to have just been started with an ash or a cigarette butt." (*Id.* at p. 485). He was clear that "there had to have been an open flame at or near that bed to set it on fire." (*Id.* at p. 492).

{¶12} At the conclusion of the State's case, Appellant's trial counsel moved for an acquittal pursuant to Crim.R. 29 which was overruled by the trial court. The defense rested without presenting evidence.

{¶13} The jury found Appellant guilty on counts one (aggravated arson), two (aggravated arson), and three (aggravated menacing) as contained in the indictment. The jury found Appellant not guilty on count four (domestic violence).

{¶14} On April 30, 2025, the trial court sentenced Appellant to an aggregate sentence of 10 to 14 years in prison with 278 days of jail-time credit. The court ordered that Appellant register as an arson offender for life and pay $1,809.87 in restitution. The court also advised Appellant that he is subject to mandatory post-release control from two to five years.

{¶15} Appellant filed a timely appeal and raises two assignments of error.

## ASSIGNMENT OF ERROR NO. 1

**THE TRIAL COURT COMMITTED PLAIN ERROR AND/OR TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY ALLOWING THE PROSECUTION TO ELICIT, EMPHASIZE, AND EXPLOIT [APPELLANT'S] POST-ARREST SILENCE IN VIOLATION OF THE**

**FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.**

{¶16} In his first assignment of error, Appellant argues his constitutional rights were violated due to the State's allowance to elicit, emphasize, and exploit his post-arrest silence.  Appellant contends it was plain error for the trial court not to have limited testimony about Appellant's flight from the scene of the fire.  Appellant further asserts his trial counsel was ineffective in not objecting to testimony about his flight from the scene of the fire.

{¶17} "Failure to raise specific constitutional errors at trial forfeits all such errors on appeal except for plain error."  *State v. Evans*, 2023-Ohio-2373, ¶ 18 (7th Dist.), citing *State v. Zuern*, 32 Ohio St.3d 56, 63 (1987); Crim.R. 52(B).

A three-part test is employed to determine whether plain error exists. *State v. Billman*, 7th Dist. Monroe Nos. 12 MO 3, 12 MO 5, 2013-Ohio-5774, ¶ 25, citing *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).

First, there must be an error, i.e. a deviation from a legal rule. Second, the error must be plain. To be "plain" within the meaning of Crim.R. 52(B), an error must be an "obvious" defect in the trial proceedings. Third, the error must have affected "substantial rights."

*Billman* at ¶ 25. In order to demonstrate that a defendant's substantial rights have been affected he must show that, but for the error, the trial outcome would have been different. *State v. Issa*, 93 Ohio St.3d 49, 56, 752 N.E.2d 904 (2001).

Plain error "is a wholly discretionary doctrine whereby the appellate court may, but need not, take notice of errors which are obvious and which affect substantial rights that are outcome determinative. . . . This elective tool is to be used with the utmost of care by the appellate court in only the most exceptional circumstances where it is necessary to avoid a manifest

miscarriage of justice." (Internal citations omitted.) *State v. Jones*, 7th Dist. No. 06 MA 109, 2008-Ohio-1541, ¶ 65.

*State v. Williamson*, 2021-Ohio-3328, ¶ 37-38 (7th Dist.).

*State v. Levesque*, 2025-Ohio-2834, ¶ 15 (7th Dist.).

"[T]he Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial." *Strickland v. Washington*, 466 U.S. 668, 684, 104 S.Ct. 2052 (1984).

In order to demonstrate ineffective assistance of counsel, Appellant must show that trial counsel's performance fell below an objective standard of reasonable representation, and prejudice arose from the deficient performance. *State v. Bradley*, 42 Ohio St.3d 136, 141-143, 538 N.E.2d 373 (1989), citing *Strickland* (, *supra*). Both prongs must be established: If counsel's performance was not deficient, then there is no need to review for prejudice. Likewise, without prejudice, counsel's performance need not be considered. *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000).

In Ohio, a licensed attorney is presumed to be competent. *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999). In evaluating trial counsel's performance, appellate review is highly deferential as there is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Bradley* at 142-143, citing *Strickland* at 689. Appellate courts are not permitted to second-guess the strategic decisions of trial counsel. *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995).

Even instances of debatable strategy very rarely constitute ineffective assistance of counsel. *See State v. Thompson*, 33 Ohio St.3d 1, 10, 514 N.E.2d 407 (1987). The United States Supreme Court has

recognized that there are "countless ways to provide effective assistance in any given case." *Bradley* at 142, citing *Strickland* at 689.

To show prejudice, a defendant must prove his lawyer's deficient performance was so serious that there is a reasonable probability the result of the proceeding would have been different. *Carter* at 558. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Bradley*, 42 Ohio St.3d 136 at fn. 1, 538 N.E.2d 373, quoting *Strickland* at 693. Prejudice from defective representation justifies reversal only where the results were unreliable or the proceeding was fundamentally unfair as a result of the performance of trial counsel. *Carter*, 72 Ohio St.3d at 558, 651 N.E.2d 965, citing *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

. . .

[A]n ineffective assistance of counsel claim cannot be predicated upon supposition. *State v. Watkins*, 7th Dist. Jefferson No. 07 JE 54, 2008-Ohio-6634, ¶ 15. Likewise, proof of ineffective assistance of counsel requires more than vague speculations of prejudice. *Id.* ¶ 55, citing *State v. Otte*, 74 Ohio St.3d 555, 565, 1996-Ohio-108, 660 N.E.2d 711.

*State v. Rivers*, 2019-Ohio-2375, ¶ 20-23, 27 (7th Dist.).

We thus refrain from second-guessing most of counsel's decisions on what questions to ask and what arguments to make. See *State v. Goodwin* (Sept. 24, 2001), 7th Dist. No. 99CA220, citing *State v. Carter* (1995), 72 Ohio St.3d 545, 558, 651 N.E.2d 965. A defendant is not guaranteed the right to the best counsel who presents a flawless trial performance. *Id.,* citing *State v. Burley* (Aug. 11, 1998), 7th Dist. No. 93CA204. Tactical omissions or debatable trial tactics are generally deemed matters of trial strategy rather than error. *State v. Clayton* (1980), 62 Ohio St.2d 45, 47, 402 N.E.2d 1189.

*State v. Baker*, 2003-Ohio-7008, ¶ 12 (7th Dist.).

*State v. Bunch*, 2024-Ohio-5085, ¶ 29 (7th Dist).

{¶18} "Failure to object to error, alone, is not sufficient to sustain a claim of ineffective assistance." *State v. Culler*, 2023-Ohio-2287, ¶ 25 (7th Dist.), citing *State v. Fears*, 86 Ohio St.3d 329, 347 (1999).

{¶19} In this case, the trial court did not commit plain error in not limiting testimony or argument as to Appellant's flight from the scene of the fire. Appellant argues that the United States Supreme Court's decision in *Doyle v. Ohio,* 426 U.S. 610 (1976) prevented the questions at issue. Appellant's reliance on *Doyle* is misplaced. In *Doyle,* the Supreme Court held that "the state, after giving a defendant *Miranda* warnings, cannot use the defendant's post-arrest silence as a means to impeach the defendant if he or she later decides to testify at trial." *State v. Eason*, 2003-Ohio-6279, ¶ 23 (7th Dist.), citing *Doyle* at 618.

{¶20} In the case at bar, Appellant did not testify. Thus, the holding in *Doyle* clearly does not apply here. The testimony at issue, addressed in detail below, was testimony by an officer on redirect examination. There is no evidence that the question and answer came after Appellant had been warned of his *Miranda* rights. This is not what the Supreme Court prohibited in *Doyle*.

{¶21} Even if *Doyle* did apply, it would not prohibit the questioning at issue. Even if a prosecutor's questions or remarks were improper, "reversal is not warranted unless the conduct complained of deprived the defendant of a fair trial." *State v. Dorff,* 2023-Ohio-3424, ¶ 27 (7th Dist.), citing *State v. Fears,* 86 Ohio St.3d 329, 332 (1999). "Thus, upon reviewing the context of the entire trial, if it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments, then the comments were harmless." *Dorff* at ¶ 27, citing *State v. LaMar,* 2002-Ohio-2128, ¶ 121. "'The touchstone of this analysis "is the fairness of the trial, not the culpability of the prosecutor."'" (Citations omitted). *Dorff* at ¶ 27.

{¶22} Appellant complains of a single question by the prosecutor and comments in his rebuttal argument. Providing context to the question with some background is necessary. On direct examination the only questions related to Appellant were whether

he was at the scene of the fire. On cross-examination, Appellant's trial counsel asked Officer Martin about Appellant's arrest specifically. Trial counsel attempted to establish that Appellant was not very far from the scene and that he was not hiding from law enforcement. Trial counsel specifically asked if Officer Martin thought Appellant was fleeing. And again, trial counsel asked if Appellant had gone very far from the scene before his arrest. This appears to be an attempt to show that Appellant was not unconcerned about the fact that his apartment had been on fire and was not far from the scene when law enforcement located him.

{¶23} On redirect examination, the State established the timeline demonstrating that Appellant was not at the scene when law enforcement responded to the emergency call and was found in the location described by Officer Martin on cross-examination the following day. Stated differently, the State was showing that Appellant was not at the scene of his burning apartment building and was apparently not concerned about the fire. The State then asked if Appellant came to law enforcement to report that his apartment was on fire, i.e., again showing that Appellant was not concerned about it. Officer Martin was unaware if he did. Finally, the State reached the exchange at issue:

Q.     And when you encountered him, did you ask if he wanted to tell his side?

A.     Yes, I did.

Q.     And his response was?

A.     No.

(4/1/2025 Jury Trial Tr., p. 451).

{¶24} The testimony was not an attempt to introduce post-*Miranda* silence as evidence of Appellant's guilt. Rather, it was to show that Appellant's actions throughout the evening of the fire and the following day demonstrated that Appellant was absent from the scene and was oddly unconcerned with the fire at his apartment building.

{¶25} During his closing, Appellant's trial counsel argued:

So why is he in the kitchen? Late night snack? No. He was looking for water.

And when he realizes there's nothing he can do, because I can't see or breathe, he leaves.

Now, I don't [know] why he didn't stick around to talk to law enforcement. I don't know why he didn't stick around for the fire department. But as we talked about in voir dire, why does that matter?

If he left because he's scared, if he left because "I don't want to see my house burn down," I don't know.

But he didn't flee. [The prosecutor] wants to use that word a lot. Flee. My client didn't flee. He went to his daughter's house.

(*Id.* at p. 539-540).

{¶26} At that point, the State objected pointing out that there had been no evidence or testimony to support trial counsel's statements. The trial court sustained the objection.

{¶27} On rebuttal, the State addressed this point in order to respond to what trial counsel had just said. The prosecutor argued:

God forbid you were ever in [a] situation where your house caught fire.

But what would you do? Would you get in the car and leave? For not an hour, not two hours, not to gather your thoughts, but to leave?

You would only do that if you were running, and [Appellant] was running.

(*Id.* at p. 547-548).

Case No. 25 BE 0016

{¶28} The State clearly pointed out that Appellant's conduct showed he was fleeing, not that he was looking for water. The State said nothing about Appellant's silence (post-*Miranda* or otherwise). The State only pointed out that Appellant's actions were of a man who started the fire, not a man who was concerned about his apartment burning.

{¶29} Thus, even if *Doyle* applied, the limited mention of Appellant's silence and his fleeing was not plain error. Rather, the brief mention of Appellant's silence and his fleeing was part of a response to Appellant's own argument that he was actually concerned about the fire. Appellant opened the door to those issues and the State was merely responding. Based on the facts presented, it was not plain error for the trial court not to have intervened to limit the testimony at that point.

{¶30} In addition, Appellant cannot show that his trial counsel was ineffective in not objecting to the limited testimony regarding him fleeing the scene of the fire. Appellant's argument is not simply that his trial counsel should have objected to the testimony and rebuttal since trial counsel could hardly have objected to such testimony once he had opened the door to it. Instead, Appellant's position is that trial counsel should not have tried to explain Appellant's own conduct of leaving the scene of the fire in the first place. This is what trial counsel was attempting to do in questioning Officer Martin about where Appellant was found and in attempting to argue in his closing that Appellant was not in fact fleeing. Trial counsel was trying to respond to Appellant's own conduct of leaving the scene of the fire he had just started.

{¶31} Upon consideration, Appellant's argument is based on debatable trial strategy. *See Bunch*, 2024-Ohio-5085, at ¶ 29 (7th Dist) (Tactical omissions or debatable trial tactics are generally deemed matters of trial strategy, not error). As stated, a failure to object is not sufficient to sustain a claim of ineffective assistance. *Culler*, 2023-Ohio-2287, at ¶ 25 (7th Dist.), citing *Fears*, 86 Ohio St.3d at 347 (1999). Appellant cannot show that trial counsel's decision not to object resulted in any prejudice. *Bunch* at ¶ 29. Even if trial counsel had objected, there is no reason to believe that the objections would have been sustained.

{¶32} Appellant's first assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 2

**THE STATE FAILED TO PRESENT LEGALLY SUFFICIENT EVIDENCE TO PROVE BEYOND A REASONABLE DOUBT (1) AGGRAVATED MENACING (R.C. 2903.21(A)), (2) AGGRAVATED ARSON UNDER R.C. 2909.02(A)(1) (KNOWINGLY CREATING A SUBSTANTIAL RISK OF SERIOUS PHYSICAL HARM TO ANOTHER BY MEANS OF FIRE), AND (3) AGGRAVATED ARSON UNDER R.C. 2909.02(A)(2) (KNOWINGLY CAUSING PHYSICAL HARM TO AN OCCUPIED STRUCTURE BY MEANS OF FIRE).**

{¶33} In his second assignment of error, Appellant alleges the State failed to present sufficient evidence to prove he committed aggravated arson under R.C. 2909.02(A)(1) and (2) and aggravated menacing under R.C. 2903.21(A).

> "When a court reviews a record for sufficiency, '(t)he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 146, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

*State v. T.D.J.*, 2018-Ohio-2766, ¶ 46 (7th Dist.).

{¶34} "'[C]ircumstantial evidence and direct evidence inherently possess the same probative value.'" *State v. Biros*, 78 Ohio St.3d 426, 447 (1997), quoting *Jenks* at paragraph one of the syllabus.

{¶35} For the reasons addressed below, we determine the judgment is supported by sufficient evidence.

{¶36} Appellant takes issue with the guilty finding for aggravated arson under R.C. 2909.02(A)(1) (count one) and 2909.02(A)(2) (count two) which states:

(A) No person, by means of fire or explosion, shall knowingly do any of the following:

(1) Create a substantial risk of serious physical harm to any person other than the offender;

(2) Cause physical harm to any occupied structure;

R.C. 2909.02(A)(1) and (2).

{¶37} Appellant also takes issue with the guilty finding for aggravated menacing under R.C. 2903.21(A) (count three) which states:

No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family. In addition to any other basis for the other person's belief that the offender will cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family, the other person's belief may be based on words or conduct of the offender that are directed at or identify a corporation, association, or other organization that employs the other person or to which the other person belongs.

R.C. 2903.21(A).

{¶38} The term "knowingly" is defined in R.C. 2901.22(B) as follows: "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature."

{¶39} R.C. 2901.01, "Definitions," states in part:

(A) As used in the Revised Code:

. . .

(4) "Physical harm to property" means any tangible or intangible damage to property that, in any degree, results in loss to its value or interferes with its use or enjoyment. "Physical harm to property" does not include wear and tear occasioned by normal use.

(5) "Serious physical harm to persons" means any of the following:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

(6) "Serious physical harm to property" means any physical harm to property that does either of the following:

(a) Results in substantial loss to the value of the property or requires a substantial amount of time, effort, or money to repair or replace;

(b) Temporarily prevents the use or enjoyment of the property or substantially interferes with its use or enjoyment for an extended period of time.

R.C. 2901.01(A)(4), (5)(a)-(e), (6)(a)-(b).

{¶40} Regarding count one, the State was required to show "beyond a reasonable doubt that on or about July 25, 2024, in Belmont County, Ohio, Robert Charles Linde did, by means of fire or explosion, knowingly create a substantial risk of serious physical harm to [the victim]." (4/1/2025 Jury Trial Tr., p. 550-551; *see also* 2 OJI-CR 509.02). Regarding count two, the State was required to show "beyond a reasonable doubt, that on or about July 25, 2024, in Belmont County, Ohio, Robert Charles Linde did, by means of fire or explosion, knowingly cause physical harm to an occupied structure; to wit, 3624 Noble Street, Apartment A, Bellaire, Ohio 43906." (4/1/2025 Jury Trial Tr., p. 553; *see also* 2 OJI-CR 509.02). Regarding count three, the State was required to show "beyond a reasonable doubt that on or about July 25, 2024, in Belmont County, Ohio, Robert Charles Linde did knowingly cause [the victim] to believe that Robert Charles Linde will cause serious physical harm to [the victim]." (4/1/2025 Jury Trial Tr., p. 555-556; *see also* 2 OJI-CR 503.21).

{¶41} In this case, the State presented sufficient evidence establishing Appellant committed the charged offenses of aggravated arson and aggravated menacing.

{¶42} As stated, Appellant and the victim were living together in an apartment building. The couple had an argument on July 25, 2024. The victim's statement to police indicated that on that date, she and Appellant "got into an argument" and "[Appellant] told [her] to leave his house" after which they exchanged words. (4/1/2025 Jury Trial Tr., p. 388). When she returned, they laid down in the bedroom where Appellant was playing with his lighter. Because Appellant's lighter was out of butane, he took hers. The victim tried to take the lighter back from Appellant. Appellant "[s]aid he was going to catch the blanket on fire" "[a]nd he did." (*Id.* at p. 389). The two were next to each other on the bed when it occurred. According to the victim's statement, Appellant already "made his usual threat" which was to "cut [her] throat." (*Id.* at p. 392). The victim indicated she was "hysterical" and that Appellant "really scared the hell out of [her]." (*Id.* at p. 393).

{¶43} The victim got up after the blanket caught fire. Appellant followed her. The victim indicated that Appellant wanted her to help put out the fire but it was too late. The victim went downstairs to tell the neighbors to get out of the building because of the fire.

A caller reported flames in the upstairs unit. When the victim went outside, Appellant's truck was gone. Appellant never contacted the victim again.

{¶44} Columbo worked as a handyman assisting the landlord of the apartment building. Columbo saw "black smoke just billowing out the back window" and yelled, "Fire. Place on fire." (*Id.* at p. 422). Columbo ran upstairs which was "just full of smoke[.]" (*Id.* at p. 423).

{¶45} Officer Martin testified that when he arrived, the smoke was "heavy[,]" and it affected his eyes and lungs. (*Id.* at p. 437). He turned around once he reached the apartment where the fire was. On Officer Martin's body camera, the victim was heard describing that Appellant had gotten "a new straight razor" that same day. (*Id.* at p. 399).

{¶46} Investigator Wright is an expert in arson investigation. He saw fire damage increasing in severity directionally towards the bed. Investigator Wright noticed burnt fabric and annealed springs. At the location of the bed, he also noticed clean burn indicating that the fire was hot enough by the bed to burn the soot away from the surface. He opined the fire was started by using a lighter to light bedding on fire. Investigator Wright knew from experience that "an open flame can ignite bedding." (*Id.* at p. 483). He testified that a lit cigarette could start a fire, but it will do so "very slow" and it would "smolder for a while." (*Id.* at p. 485). Investigator Wright stated that this fire "was too rapid of a fire to have just been started with an ash or a cigarette butt." (*Id.* at p. 485). He was clear that "there had to have been an open flame at or near that bed to set it on fire." (*Id.* at p. 492).

{¶47} Investigator Wright's testimony rules out Appellant's argument that the fire was started accidentally. Investigator Wright was the only expert witness called to testify. He opined that the fire was started with an open flame. Investigator Wright specifically denied that the fire could have been started with ash from a cigarette or the lit cigarette itself. In addition, the victim's testimony also provides sufficient evidence to support that Appellant started the fire knowingly rather than accidentally, i.e., the threats made to her by Appellant, her testimony that Appellant did light the blanket on fire, and the fact that Appellant left the scene instead of staying to help put out the fire.

{¶48} Regarding counts one and three, Appellant also challenges that the victim was placed at a substantial risk of serious physical harm. The trial court instructed the

jury as follows: "The words 'substantial risk' means a strong possibility as contrasted with a remote or even a significant possibility that a certain result may occur or that certain circumstances may exist." (4/1/2025 Jury Trial Tr., p. 551; *see also* R.C. 2901.01(A)(8)). The court also instructed the jury:

> The words 'serious physical harm to persons' means any of the following:
>
> Any physical harm that creates a substantial risk of death; any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity; any physical harm that involves some permanent disfigurement or that involves some temporary serious disfigurement; and any physical harm that involves acute pain of such duration as the result of the substantial suffering or that involves any degree of prolonged or intractable pain.

(4/1/2025 Jury Trial Tr., p. 551-552; *see also* R.C. 2901.01(A)(5)).

{¶49} The testimony reveals the victim was placed at a substantial risk of serious physical harm. Again, the blanket on the bed where the victim was lying caught on fire. Columbo indicated the apartment was "just full of smoke[.]" (4/1/2025 Jury Trial Tr., p. 423). Officer Martin stated that when he arrived, the smoke was "heavy[,]" and it affected his eyes and lungs. (*Id.* at p. 437). He turned around once he reached the apartment where the fire was.

{¶50} Finally, regarding counts one and two, Appellant also challenges whether the State provided sufficient evidence to show that the substantial risk of serious physical harm was caused by means of a fire. The Ohio Revised Code does not contain a definition of "fire" relating to arson offenses. In *State v. Boggs,* 2003-Ohio-6968, (11th Dist.), our Sister Court gave the term its "meaning generally understood in common usage." *Id.* at ¶ 25. The *Boggs* court defined "fire" as "'(a) rapid, persistent chemical reaction that releases heat and light, esp. the exothermic combination of a combustible substance with oxygen.'" (Citation omitted). *Id.* The *Boggs* court held that the flame from a cigarette lighter constituted a "fire" for purposes of R.C. 2909.02. *Id.*

Case No. 25 BE 0016

{¶51} The evidence in the case at bar was more than sufficient to show that Appellant used a lighter to start a fire. The victim realized there was a fire when she saw "flames." (4/1/2025 Jury Trial Tr., p. 412). Columbo saw "black smoke just billowing out the back window" and yelled, "Fire. Place on fire." (*Id.* at p. 422). The upstairs of the apartment was "just full of smoke[.]" (*Id.* at p. 423). Investigator Wright noticed burnt fabric and annealed springs. At the location of the bed, he also noticed clean burn, indicating that the fire was hot enough by the bed to burn the soot away from the surface.

{¶52} Pursuant to *Jenks,* 61 Ohio St.3d 259, there is sufficient evidence upon which the jury could reasonably conclude beyond a reasonable doubt that the elements of aggravated arson and aggravated menacing were proven. Thus, the trial court did not err in overruling Appellant's Crim.R. 29 motion.

{¶53} Appellant's second assignment of error is without merit.

## CONCLUSION

{¶54} For the foregoing reasons, Appellant's assignments of error are not well-taken. The April 30, 2025 judgment of the Belmont County Court of Common Pleas convicting Appellant for aggravated arson and aggravated menacing and sentencing him to 10 to 14 years in prison following a jury trial is affirmed.

Robb, P.J., concurs.

Hanni, J., concurs.

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Belmont County, Ohio, is affirmed. Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**